Alva S. STAPLES, as owner of THE Scow WILMER S. NICKERSON and on behalf of the Captain of the scow Wilmer S. Nickerson, for loss of personal possessions, Libelant,

v.

ACE BUILDERS SUPPLY CO., Inc., Respondent.

Alva S. STAPLES, as owner of a cargo of bricks, lately laden aboard the scow Wilmer S. Nickerson, Libelant,

v.

ACE BUILDERS SUPPLY CO., Inc., Respondent.

ACE BUILDERS SUPPLY CO., Inc., Cross-Libelant.

v.

Alva S. STAPLES, Cross-Respondents.

United States District Court
S. D. New York.
Nov. 27, 1957.

Macklin, Spear, Hanan & McKernan, New York City, for Staples.

Kirlin, Campbell & Keating, New York City, for Ace Builders Supply Co., Inc.

Thomas F. MURPHY, District Judge.

These three libels, consolidated for trial, arise from the sinking of libelant's scow Wilmer S. Nickerson at the berth of respondent in the Bronx River on November 7, 1953, occasioned, it is claimed, by a foul berth. Two libels relate to the damage to the scow and the loss of its captain's belongings, and the other to the loss of the cargo of bricks. The cross-libel is a claim by respondent for work, services and labor in salvaging the brick.

Libelant is a brick manufacturer at Malden, New York, and respondent is a dealer in building supplies with a wharf on the Bronx River.

On November 4, 1953, pursuant to an order for a scow load of bricks, libelant nominated its scow to carry 291 units of brick from Malden, New York, to respondent's wharf on the Bronx River. A Cornell tugboat took the scow in tow and brought it, without incident, first to the so-called market located at about Pier 80 on the North River. After mooring there for a short while, the scow was towed around the Battery to about 34th Street on the East River to await a favorable tide and then proceeded up the East River to respondent's wharf at about 10 a. m. on November 6, 1953, on the flood tide. It was secured to respondent's wharf portside-to, respondent's employees on the shore side giving a hand. After the scow was secured respondent removed about 22 units of brick and knocked-off work for the weekend, November 6th being a Friday. It is undisputed that the scow took the bottom on the following two ebb tides without incident.

At about 11 a. m. on November 7, 1953, the scow captain slacked off his lines, pumped his scow and left for his home for the weekend, leaving no one in charge; respondent's employees were also away for the weekend.

On November 6, 1953, there was a severe storm or hurricane and the tides were unusually high—in fact when the scow captain left his scow on the morning of November 7th the water was over the bulkhead of the wharf. The scow captain knew and admitted that such tides would result in unusually low tides.

Libelant offered no direct evidence as to the sinking of the scow but introduced in evidence a chart of the berth based upon soundings and sweepings made on December 5, 1953, which, if believed, illustrates a shoal condition immediately adjacent to the wharf that was dangerous for vessels that would take the bottom on low tide. It then introduced experts who testified that because of such shoal condition and the loaded condition of the scow when it rested on the bottom at low tide there was brought about a twist in the scow's hull, which twist, in

turn, was the proximate cause of its taking in water and its consequent inability to rise again when the tide flooded.

Respondent, on the other hand, introduced testimony of witnesses who were called to the scene on the evening of November 7th while the scow was still afloat. From their testimony it is apparent that at 6:00 or 7:00 o'clock in the evening one or two of the scow's lines had already parted and the scow was secured to the wharf by only one line from its bow, and that it was at that time some 15 feet off the wharf, listing to starboard and taking water rapidly through its hatches.

Efforts were made by respondent's employees and the New York City Police to get aboard the scow to slacken its line and to get assistance, all without avail, and suddenly the remaining line parted and the scow drifted farther out and sank.

It is respondent's claim that the sinking of the scow was occasioned solely by the negligence of libelant in its failure to have the scow attended, especially in view of the violent storm the day before and the unusually high and low tides consequent thereon.

While it is undoubtedly true that the consignee of a vessel is bound to provide a safe berth and to use reasonable care to ascertain the condition of a berth, we find as a fact that the foul bottom, if in fact it existed, was not the proximate cause of the casualty, but rather that the cause was the negligence of libelant in failing to properly tend and slacken the lines. Quite obviously this was not done since the scow captain was away for the weekend.

This determination makes moot the question of the set-off relating to an oral contract to insure and leaves for consideration only the cross-libel for work, labor and services in salvaging the brick.

Although there was some testimony by respondent along these lines we find that it never reached any contractual status as opposed to a purely voluntary gesture.

We are fortified in this finding by the tardiness in presenting the claim and the circumstances under which it was allegedly made.

Accordingly, all of the libels are dismissed without costs.

Decree accordingly.