**Alva S. STAPLES, owner of the scow The WILMER S. NICKERSON and her cargo, Libelant-Appellant,**

v.

**ACE BUILDERS SUPPLY CO., Inc., Respondent-Appellee and Cross-Appellant.**

**No. 49, Docket 25063.**

United States Court of Appeals
Second Circuit.

Argued Dec. 10, 1958.

Decided Jan. 7, 1959.

John C. Hart, of Macklin, Speer, Hanan & McKernan, New York City, for Alva S. Staples, appellant.

James McGarry, New York City (Michael F. Whalen, of Kirlin, Campbell & Keating, New York City, on the brief), for Ace Builders Supply Co., Inc., appellee and cross-appellant.

Before CLARK, Chief Judge, and HINCKS and LUMBARD, Circuit Judges.

CLARK, Chief Judge.

On the evening of November 7, 1953, the scow The Wilmer S. Nickerson, fully laden with brick, sank at her berth in the yard of respondent Ace Builders Supply Co., Inc. Libelant Staples, owner of the scow and the cargo of bricks aboard her, brought libels in admiralty for damages to both upon the theory that Ace had violated its duty to provide a safe berth. Ace cross-libeled for expenses it incurred in helping to salvage the brick and for the loss of use of its dock during these salvaging operations. In a reasoned opinion, D.C. S.D.N.Y., 159 F.Supp. 789, Judge Murphy held that whether or not the berth was foul, the proximate cause of the sinking was the scow captain's failure to slacken her lines, not the condition of the berth. Hence Staples could not recover. Ace's services, he further held, were offered voluntarily; and so it, too, could not recover. Both parties appeal. As the appeals raise only questions of fact, each ruling must be affirmed unless clearly erroneous. McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L. Ed. 20; Schroeder Bros., Inc. v. The Saturnia, 2 Cir., 226 F.2d 147, 149.

Weather conditions on November 6–7, 1953, comprised a "northeaster" of full force, with snow, high winds, and excessive tidal fluctuations. On November

7 at 11:00 a. m., when the Nickerson's captain departed for the week end, the tide was unusually high and a correspondingly unusual ebb tide was expected to follow. With the captain's departure, the Nickerson was left unattended. Libelant's evidence tended to show that the bottom of the berth sloped rather sharply away from the dock where the scow was tied port side to, and that the area under the after portion of the barge was particularly high and rather rocky. The wooden scow, when raised, was found to have a twist, with two bottom planks on the port side aft broken. The testimony was sufficient to establish that all this damage could have been caused by the condition of the berth bottom near the wharf, if in fact she there took ground. The conclusion of libelant's experts was that water, entering through the hole in her bottom and through seams and butts opened by the twist, in conjunction with the sharp slope of the berth bottom had prevented the scow from righting herself when the tide turned.

The trial court's finding that the libelant's failure properly to tend and slacken the lines caused the Nickerson to sink made unnecessary specific findings accepting or rejecting this evidence. While the express ground of dismissal was lack of proximate cause, a precise definition of the scope of the wharfinger's duty here or of any duty on the bargee's part to ground the scow a safe distance away from the dock was unnecessary. For the court clearly found as a fact that, hung on her lines, which all ultimately parted, and sharply listing to starboard, the Nickerson filled with water through her hatches before she took the bottom. D.C.S.D.N.Y., 159 F.Supp. 789, 791. This ruling is amply supported by the evidence; indeed, no different conclusion could have been reached without disregarding the testimony of all of the eyewitnesses to the sinking. Respondent's employees, who arrived at the scene only minutes before the sinking, testified that the Nickerson, then tied to the wharf only by her bow line, was still afloat, though listing so sharply that her hatches were awash and taking water rapidly. Shortly after their arrival the bow line parted and the scow drifted ten feet or so to midstream and sank. Significantly, these witnesses stated that the scow's stern was lower than her bow all this time. From libelant's survey of the berth it seems that had the Nickerson been aground before the bow line parted, her stern would have been somewhat higher than her bow.

Moreover, according to libelant's own expert the scow should first have taken the bottom about 3:00 p. m.—assuming that her lines were sufficiently slack. One Wikman, the sole witness to the barge's condition in the early afternoon, testified that her lines were taut, that she had taken a list to starboard as early as 1:00 p. m., and that by 3:00 p. m. the list was so sharp that her starboard decks amidships were covered by three to four inches of water and units of brick occasionally tumbled overboard. Additionally, there was evidence that, despite the scow's great weight, it was possible for her to get hung on her lines; there was some evidence of strain damage from the pull of the lines; and the proof shows that on the day of the sinking the scow was so heavily laden as to have only seven or eight inches of freeboard. All in all, there is sufficient foundation for Judge Murphy's conclusion that improper mooring was the cause of the accident.

As to respondent's claim for the reasonable value of its services in storing certain brick salvaged from the scow and for the loss of use of a portion of its dock during the salvage operation, Judge Murphy found that there was an arrangement between the parties which "never reached any contractual status as opposed to a purely voluntary gesture." D.C.S.D.N.Y., 159 F.Supp. 789, 791. In view of respondent's belated assertion of this claim and the sketchiness of the transaction between the parties as described in the testimony, we cannot say that this finding was clearly erroneous.

Affirmed.